UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSE RAMIREZ,

               Plaintiff,

     v.

FREDERICK BERNSTEIN, Medical Director;
SGT. TIMOTHY DURLAND; C.O. KERBIN
WICKHAM; and C.O. KEVIN FOX,

             Defendants.

No. 17 Civ. 3825 (VB)


**AMENDED COMPLAINT**


**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

Page

NATURE OF THE ACTION ................................................................................. 1

JURY DEMAND ................................................................................................... 1

JURISDICTION AND VENUE ............................................................................ 1

PARTIES ............................................................................................................... 2

STATEMENT OF FACTS .................................................................................... 2

    A.   Green Haven Has A Long History Of Denying Inmates Adequate Medical Care ......... 2

    B.   In 2011 And 2012, While Incarcerated At Green Haven, Mr. Ramirez Has Two Botched Back Surgeries ................................................................. 5

    C.   Between 2013 And 2015, Dr. Bernstein Repeatedly Denied Mr. Ramirez Admittance To The UPD Despite The Recommendations Of Mr. Ramirez's Primary Care Providers ................................................................... 6

    D.   On August 6, 2015, Mr. Ramirez Is Assaulted By Sgt. Durland And C.O.s Wickham And Fox ................................................................. 13

    E.   The Assault Caused Injuries To Mr. Ramirez's Upper Body ....................................... 14

    F.   To Cover Up Their Misconduct And To Further Harm Mr. Ramirez, Defendants Charge Mr. Ramirez With Rules Violations ............................................... 18

    G.   Mr. Ramirez Attempts To Seek Redress After The Assault ......................................... 19

FIRST CAUSE OF ACTION:  VIOLATIONS OF PLAINTIFF'S CIVIL RIGHTS UNDER THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION (EXCESSIVE FORCE) BY SGT. DURLAND AND OFFICERS FOX AND WICKHAM ....... 24

SECOND CAUSE OF ACTION:  VIOLATIONS OF PLAINTIFF'S CIVIL RIGHTS UNDER THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION (DEFICIENT MEDICAL CARE AND CONDITIONS OF CONFINEMENT) BY DR. BERNSTEIN .......................................................................................................... 25

THIRD CAUSE OF ACTION:  VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12131, ET SEQ. BY DR. BERNSTEIN .............................. 27

FOURTH CAUSE OF ACTION:  VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT OF 1973, 29 U.S.C. § 794 ET SEQ. BY DR. BERNSTEIN ............ 29

PRAYER FOR RELIEF ......................................................................................... 31

Plaintiff Jose Ramirez, by and through his attorneys, Gibson, Dunn & Crutcher LLP, as and for his Amended Complaint, alleges as follows:

## NATURE OF THE ACTION

1.     Plaintiff Jose Ramirez is a former inmate at Green Haven Correctional Facility ("Green Haven") in Stormville, New York.  Green Haven is a maximum security facility operated by the New York State Department of Corrections and Community Supervision (the "DOCCS"). On May 28, 2008, Mr. Ramirez walked into prison a healthy man.  Nearly a decade later, Mr. Ramirez was rolled out of prison in a wheelchair, severely disabled and in constant pain.  He brings this action pursuant to 42 U.S.C. § 1983 and the Eighth Amendment to the United States Constitution, Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794 *et seq.*, seeking relief for unconstitutionally deficient medical care, unconstitutional conditions of confinement, the failure to reasonably accommodate his disabilities, and the excessive use of force against him during his incarceration at Green Haven.  Mr. Ramirez seeks compensatory and punitive damages, declaratory relief, attorneys' fees, and any such other and further relief as the court deems just and proper.

## JURY DEMAND

2.     Plaintiff demands a trial by jury in this action on each and every one of his claims pursuant to Fed. R. Civ. P. 38(b).

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a), because this action arises under 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.*

4.      Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to Plaintiff's claim occurred in this judicial district.

## PARTIES

5.      Plaintiff JOSE RAMIREZ is a citizen of the United States.  He currently resides in Yonkers, New York.

6.      Defendant FREDERICK BERNSTEIN is or was, at all relevant times, the medical director at Green Haven.  Defendant BERNSTEIN is sued in his official and individual capacities.

7.      Defendant KERBIN WICKHAM is or was, at all relevant times, a Correction Officer employed at Green Haven.  Defendant WICKHAM is sued in his individual capacity.

8.      Defendant KEVIN FOX is or was, at all relevant times, a Correction Officer employed at Green Haven.  Defendant FOX is sued in his individual capacity.

9.      Defendant TIMOTHY DURLAND is or was, at all relevant times, a Sergeant employed at Green Haven.  Defendant DURLAND is sued in his individual capacity.

10.     At all times relevant herein, Defendants were employees of the State of New York and acted within the scope of their employment under color of state law.

## STATEMENT OF FACTS

**A.      Green Haven Has A Long History Of Denying Inmates Adequate Medical Care**

11.     Plaintiff Jose Ramirez is a former inmate at Green Haven.

12.     Green Haven has a long history of denying inmates adequate medical care, including disability accommodations.

13.     In 1980, a class of present and future Green Haven inmates challenged the constitutionality of Green Haven's provision of health care services, alleging that such services were so inadequate that their Eighth and Fourteenth Amendment rights to be free from cruel and

unusual punishment were being violated.  *See* Amended Complaint, Dkt. No. 17, *Milburn v.*

*Coughlin*, No. 79 Civ. 5077 (S.D.N.Y. Apr. 25, 1980).

14.     In 1982, the court entered a consent decree providing injunctive relief to the class

members, requiring Green Haven to make certain reforms to its health services.  Among other

things, Green Haven agreed to hire another half-time doctor and dentist; hold sick call every day;

ensure access to x-rays and other diagnostic tests; provide access to medical specialists; open a

unit for the physically disabled ("UPD") as soon as they finished hiring the necessary staff; and

discontinue the use of inmate workers to provide medical services.  *See* Final Judgment by

Consent, Dkt. No. 96, *Milburn v. Coughlin*, No. 79 Civ. 5077 (S.D.N.Y. Aug. 20, 1982).

15.     "About seven years later, plaintiffs filed a motion to hold the Green Haven

defendants in contempt for violating the 1982 consent decree and to modify the consent judgment

to achieve its original purpose.  In response the district court appointed a medical auditor, Dr.

Robert Cohen, who determined that Green Haven was not in compliance with the consent

judgment and recommended additional modifications to improve health care at the facility." *Irvin*

*v. Harris*, 944 F.3d 63, 66 (2d Cir. 2019) (referencing the *Milburn* consent decree).

16.     In 1991, the district court entered a modified consent decree, which required "Green

Haven to create and maintain an ADA and Rehabilitation Act-compliant unit for the physically

disabled—the UPD—and establishing certain guidelines for adequate medical care." *Woods v.*

*Goord*, 2002 WL 731691, at *7 n.13 (S.D.N.Y. Apr. 23, 2002) (referencing Modified Final

Judgment by Consent, Dkt. No. 251, *Milburn v. Coughlin*, No. 79 Civ. 5077 (S.D.N.Y. Aug. 1,

1991)).

17.     The 1991 modified consent decree also mandated that inmates "confined in the

UPD shall be placed in a cell or room that is equipped with a handicapped accessible sink and

toilet, trapeze and grip bars, and a bed that permits reasonable access from a wheelchair, if needed." Modified Final Judgment by Consent, Dkt. No. 251 at 28, *Milburn v. Coughlin*, No. 79 Civ. 5077 (S.D.N.Y. Aug. 1, 1991).  It required the UPD to have "[s]ufficient number of handicapped accessible showers and shower chairs for this population." *Id.*

18.     Dr. Cohen audited Green Haven's health care system from 1991 until 2014.  "His three-year term was repeatedly extended because Green Haven was not in full compliance with the 1991 consent decree." *Irvin*, 944 F.3d at 66.

19.     At a Public Hearing on Healthcare in New York Correctional Facilities, Mr. Stefen Short, Staff Attorney for the Legal Aid Society, Prisoner's Rights Project, testified that Green Haven's UPD was created for inmates "who use wheelchairs and have limited mobility":

> One concrete example of the importance of adequate oversight is evinced by the unit for the physically disabled at Green Haven Correctional Facility.  That unit was created over two decades ago as part of a federal consent judgment in Milburn, the case in which we were class counsel.  **It was created for people with acute, serious or complex medical needs, including many who use wheelchairs and have limited mobility**.

> The unit's policies and practices kept its vulnerable population safer and healthier than they would otherwise have been.  After the unit was built, and millions of dollars spent to retrofit it, we believed it would be a lasting achievement and a model for how to provide this kind of medical care in prisons.  There was medical staff in the unit, a buzzer system and doctors assigned to individual patients.  Unfortunately, after the consent judgment that we were monitoring ended in 2015, the department immediately began dismantling the unit, which no longer exists as such, despite continuing need.

*Healthcare in New York Correctional Facilities: Public Hearing Before Assemb. Comm. on Health & Assemb. Comm. on Corr.*, 202d Sess. 253–54 (N.Y. 2017) [hereinafter *Correctional Facilities Healthcare Hearing*] (statement of Stefen Short, Staff Attorney, Legal Aid Society Prisoner's Rights Project) (emphasis added).

20.     In 2015, the district court terminated the consent decree per defendants' unopposed motion and without notice to any class members.  *See Irvin*, 944 F.3d at 66.

4

21.     In 2019, the Second Circuit held that the 2015 termination of the consent decree "violated Rule 23(a)(4) and the Due Process Clause because the class was inadequately represented at the times relevant to the termination proceedings."  *Irvin*, 944 F.3d at 65.

**B.     In 2011 And 2012, While Incarcerated At Green Haven, Mr. Ramirez Has Two Botched Back Surgeries**

22.     On June 23, 2011, Mr. Ramirez underwent a laminectomy of the fifth lumbar spine vertebrae ("L5"), which is a surgical procedure on the greater lumbar region of the spine, an area commonly referred to as the "small" of the back (the "2011 Surgery").  The surgical plan was to fix disk herniations and an annular tear in Mr. Ramirez's spine.  The surgery took place at Putnam Hospital Center and was performed by Dr. Charles P. Garell.  *See* Exs. 1, 2.

23.     After the 2011 Surgery, Mr. Ramirez continued to experience pain in his mid- and lower back.  *See* Ex. 1.

24.     As a result, on September 13, 2011, a magnetic resonance imaging ("MRI") was performed on Mr. Ramirez's back, which revealed, among other things, a "midline annular tear and tiny central protrusion on a congenitally shallow canal" at the fourth and fifth lumbar spine vertebrae, "a midline annular tear and shallow central disk bulge" at the second and third lumbar spine vertebrae, and "a left paramidline disk herniation with a small cranially extruded fragment" at the first and second lumbar spine vertebrae.  *See* Ex. 3.

25.     As a result of the 2011 Surgery, Mr. Ramirez lost effective use of his legs and received a permit for "wheelchair use."  Ex. 4.  On October 31, 2011, a medical specialist recommended an increase in pain medication for Mr. Ramirez.  On November 2, 2011, Mr. Ramirez's primary care provider increased Mr. Ramirez's pain medication.  *See id.*

26.     On January 13, 2012, Mr. Ramirez had another surgical procedure to fix errors committed by Dr. Garell in the 2011 Surgery.  Specifically, Mr. Ramirez had an L5 laminectomy

with fluoroscopy, for repair of a dural tear (the "2012 Surgery"). *See* Ex. 5. During this surgery, the remnants of the L5 larnina were identified and removed and a subdural tear was noted and repaired.

27.     Despite the second surgery, Mr. Ramirez continued to be confined to a wheelchair.

**C.     Between 2013 And 2015, Dr. Bernstein Repeatedly Denied Mr. Ramirez Admittance To The UPD Despite The Recommendations Of Mr. Ramirez's Primary Care Providers**

28.     On October 30, 2013, according to an ambulatory health record progress note, Mr. Ramirez's primary care provider recommended to Dr. Bernstein that Mr. Ramirez be transferred to the UPD. *See* Ex. 6 ("PT. recom. transfer to UPD.").

29.     On November 3, 2013, Mr. Ramirez filed a grievance, titled "Deliberate Indifference," with the Inmate Grievance Resolution Committee ("IGRC"), alleging that Dr. Bernstein denied him access to the UPD despite the recommendation of his primary care provider, P.A. Enrique Pagan (the "November 2013 Grievance"). *See* Ex. 7. Mr. Ramirez wrote: "Dr. Bernstein has constantly ignored my serious medical needs by denying placement into the UPD. Even though I'm disabled and constantly deteriorating." *Id.* Mr. Ramirez explained that this "complaint involves arguable basis in law and factual constitutional and civil rights violations: 14th U.S. Constitutional Amendment, and American for Disability Act [sic]." *Id.* He went on to note that:

> Recently a representative from D.O.C.S. Deputy Commissioner for the Health Services ask[ed] about my medical needs, and my provider P.A. Pagan told him that I need UPD placement. Dr. Bernstein told him that I will not be placed in UPD. Dr. Bernstein will not put me in UPD do [sic] to the damages that I have sustained during an incident.

Mr. Ramirez closed the grievance with a desperate plea that "Dr. Bernstein is putting my health and life in serious risk." *Id.*

6

30.     On November 21, 2013, Mr. Ramirez submitted a Request for Reasonable Accommodation form.  Mr. Ramirez requested his disability be reasonably accommodated by admittance to the UPD.  In making the request, Mr. Ramirez stated:

> I am disabled, wheelchair bound, my condition is steadily getting worse.  I have mobility issues, my ability even move short distances is seriously limited, I need help getting in and out of my cell, I can't access the shower without assistance, I need to be placed in an atmosphere where I can get assistance at all times.

Ex. 8.

31.     On December 18, 2013, Mr. Ramirez resubmitted the November 2013 Grievance with the IGRC.  *See* Ex. 7.

32.     On December 27, 2013, the IGRC acknowledged receipt of a complaint from Mr. Ramirez titled: "Reg. 2nd opinion/UPD."

33.     Determined to receive appropriate medical care, on January 3, 2014, Mr. Ramirez filed a grievance request for a second opinion and again requested placement in the UPD.  *See* Ex. 9.

34.     On January 27, 2014, Mr. Ramirez complained to Dr. Robert Bentivegna, a physician at Green Haven, that he should be admitted to the UPD.  *See* Ex. 10.  Dr. Bentivegna's notes show that Mr. Ramirez came to him with "multiple complaints.  Generally chronic (supposed to go to UPD, had surgery, arm weakness etc.)."  *Id.*

35.     On February 26, 2014, three months after Mr. Ramirez submitted the Request for Reasonable Accommodation form, Dr. Bernstein filled out a section of the form, titled "Medical Verification," and signed it.  In the "Medical Verification" section, Dr. Bernstein writes that Mr. Ramirez's "[d]isability" is "[l]ower extremity weakness" and notes that Mr. Ramirez had "[f]lats and wheelchair for long distances."  Ex. 8.

36.     On February 28, 2014, the IGRC conducted a hearing regarding Mr. Ramirez's grievance pertaining to his denial of UPD placement.  *See* Ex. 9.

37.     Notwithstanding that the UPD was created for inmates "who use wheelchairs and have limited mobility," *Correctional Facilities Healthcare Hearing* (statement of Stefen Short), on March 5, 2014, Mr. Ramirez's reasonable accommodation request was denied.  The stated reason for the denial was that an "[i]nmate's placement in C-Block (UPD) is done through medical dept.  The facility can accommodate the offender's housing in the regular cell or the flats of any housing block."  Ex. 8.  On March 14, 2014, Mr. Ramirez filed his disagreement with this decision. *See id.*

38.     On July 15, 2014, at the request of Green Haven Superintendent William Lee, Dr. Bernstein responded to a letter Mr. Ramirez wrote to Superintendent Lee on July 7, 2014.  Dr. Bernstein wrote that: "Your pain is being treated with Morphine 60 mg. 2x per day and Gabapentin 600 mg. 2x per day.  You were issued a permit for a wheelchair, wheelchair cushion and for the barbershop.  That permit is still current."  Ex. 11.  Dr. Bernstein went on to state: "The swelling in your legs is being evaluated (a pending ultrasound) and treated (diuretics)."  *Id.*  After acknowledging Mr. Ramirez's serious medical conditions and his need for a wheelchair, Dr. Bernstein ended the letter with the following conclusory statement: "You were considered for transfer/admission to the UPD.  The UPD Interdisciplinary Committee did not approve you for admission to the UPD."  *Id.*

39.     On August 22, 2014, the Green Haven Superintendent affirmed the IGRC decision denying Mr. Ramirez admittance to the UPD.  *See* Ex. 9.

40.     On November 18, 2014, Mr. Ramirez once again complained to a Green Haven medical provider that he was not being admitted to the UPD.

41.     On February 16, 2015, Mr. Ramirez wrote a letter to the IGRC "to address the fact that [he was] being denied adequate aftercare treatment (*i.e.*, physical therapy and placement in the U.P.D.)." Ex. 12.  Mr. Ramirez explained that:

> This grievance is specifically about the fact that, according to medical Director Dr. Bernstein the "Interdisciplinary Committee" has denied me access to U.P.D. housing.  Clearly, this is a denial of my right to be protected from cruel and unusual punishment and deliberate medical indifference.  In the past, Dr. Pagan had expressed my need for placement in U.P.D. housing to a representative from DOCCS' office of the Deputy Commissioner of Health Services:  Thus, conveying to him that I need placement in U.P.D. housing.  According to Dr. Bernstein, "Interdisciplinary Committe[e]" has denied me such housing.

> Dr. Pagan has confirmed my need for placement in U.P.D. and further physical therapy aftercare due to continual pain and my inability to move about.  The fact that "Interdisciplinary Committee" refuses to have me assigned to U.P.D. housing, which would facilitate me [sic] aftercare recovery, is clearly deliberate indifference.

*Id.*  As a resolution, Mr. Ramirez requested that "I be provided with the aftercare that has been prescribed and suggested by my provider in the past, and that I be placed in the Unit for the Physically Disabled (U.P.D.), where I can receive proper assistance for my personal and ambulatory needs." *Id.*

42.     On March 6, 2015, Mr. Ramirez filed a grievance alleging a denial of proper medical care that exacerbated previous injuries and directly caused new injuries.  *See* Ex. 13.

43.     On March 27, 2015, the IGRC determined that Mr. Ramirez was receiving adequate medical care (the "March IGRC Decision").

44.     On March 31, 2015, Mr. Ramirez appealed the March IGRC Decision to Superintendent Griffin.

45.     On April 7, 2015, Mr. Ramirez wrote a letter to Superintendent Griffin complaining that he was denied placement in the UPD because of disciplinary reasons and that Dr. Bernstein continued to ignore his medical issues and needs.  *See* Ex. 1.  Mr. Ramirez explained: "I am a special needs offender, I am wheelchair bound, and I should be in UPD.  I have addressed my

9

medical issues to Dr. Bernstein and he still refers me to mental health and continues to ignore my issues." *Id.* Mr. Ramirez went on to state that "I am writing this to you because the many times I stopped you to explain to you my situation, you told me to write to you, so here I am writing to you hoping that I can get medical treatment." *Id.* That same day, according to an ambulatory health record progress note, Mr. Ramirez again requested that he be admitted to the UPD when meeting with a Green Haven medical provider.

46. On April 17, 2015, Mr. Ramirez wrote a letter to Dr. Wolfe, another physician at Green Haven, requesting placement in the UPD. Superintendent Griffin and Dr. Bernstein were copied on the letter. Mr. Ramirez explains that:

> I am writing pursuant to the decision and instruction rendered by Superintendent William Griffin in response to a grievance of mine, in which I requested placement in the Unit for the Physically Disable[d] (U.P.D.).

> I am requesting placement in U.P.D. due to the fact that my present condition has me confined to a wheel chair, as a result of two back surgeries. I am unable to perform the daily task of standing on both legs, walking, bending to clean myself or my living quarters (cell). Furthermore, I have difficulty making my way from my cell to my wheelchair when leaving my cell. Therefore, I am requesting placement in U.P.D. to assist me with these issues.

Ex. 14. Mr. Ramirez went on to describe his severe pain: "I am also requesting that I be examine[d] by a specialist to assess the degree of present ailment, and why I am in so much pain." Finally, Mr. Ramirez noted that:

> It is important that I bring to you[r] attention that I am now presently housed in B-Block on 4 Company. On this particular gallery **there is no shower chair for those inmates who are wheelchair bound. I am asking that you provide me with a permit for the usage of shower chair and request that this gallery is provided with one**.

*Id.* (emphasis added).

10

47.     On April 21, 2015, the IGRC informed Mr. Ramirez that his application for UPD housing had been denied and noted that "[i]f your provider feels it is necessary, he can resubmit grievants [sic] application for UPD." Ex. 13.

48.     As per the IGRC's instruction, on April 28, 2015, Mr. Ramirez's primary care provider, P.A. Pagan, filled out an Ambulatory Health Record Progress Note, detailing his plan to "Resubmit UPD papers as per [Mr. Ramirez's] grievance." Ex. 15.

49.     Notwithstanding the recent recommendation by Mr. Ramirez's primary care provider, P.A. Pagan, that Mr. Ramirez be admitted to the UPD, on May 12, 2015, Susanna Nayshuler, Regional Health Services Administrator, DOCCS, wrote a letter to Mr. Ramirez, notifying him that "[t]he Division of Health Services has investigated your concerns with the Health Services Staff at Green Haven" and determined that "a UPD placement is not medically indicated at this time." Ex. 16. Ms. Nayshuler also callously determined without explication that Mr. Ramirez's "request to use a shower chair is not medically necessary at this time." *Id.* This conclusory determination that UPD placement was not medically indicated and that a shower chair was not medically necessary strains credulity given that the letter itself references that Mr. Ramirez is wheelchair-bound.

50.     On September 17, 2015, Mr. Ramirez was transferred from Green Haven to Five Points Correctional Facility ("Five Points"). At no point during his time at Green Haven was Mr. Ramirez placed in the UPD.

51.     The denial of placement in the UPD at Green Haven, despite being wheelchair-bound, prevented Mr. Ramirez from carrying out basic daily activities without incurring pain, humiliation, or risk of serious injury.

52.    Mr. Ramirez spent his entire time at Green Haven housed in a non-wheelchair-accessible cell, which required him to leave his wheelchair in the hallway outside and to enter his cell by grabbing onto the cell bars and dragging himself into the room and onto the bed.  This maneuver, which would not have been necessary in the UPD, was dangerous, painful, and scarred his legs.

53.    Given Mr. Ramirez's physical limitations, he was unable to clean his cell without assistance.  As a result, Mr. Ramirez was forced to live in a cell that was often left in an unsanitary state of disarray, with garbage strewn about.

54.    Mr. Ramirez also struggled to clean himself.  Because Mr. Ramirez had been denied the use of a shower chair and because his wheelchair could not traverse the shower curb, he was constantly faced with a set of unacceptable choices:  attempt to hold himself up in the shower without any seating by holding onto the wall (at great risk to his safety); request that fellow inmates—entirely untrained in how to properly assist a disabled individual—carry him and his wheelchair into the shower (soaking the wheelchair and causing it to smell); or, skip a shower altogether.

55.    At Five Points, Mr. Ramirez was immediately placed in a wheelchair-accessible cell, with a wheelchair-accessible shower.

56.    While at Five Points, on September 9, 2016, Mr. Ramirez filed a request for reasonable accommodation stating that he was limited in his ability to: "pushing wheelchair and picking up off flor and reaching up high."  Ex. 17.  The accommodation request was for a "cell assist and mobility assist."  *Id.*  On September 27, 2016, a doctor provided medical verification that Mr. Ramirez has "neck pain, upper extremity weakness, 2° [secondary] to cervical spinal

stenosis" and decreased use of his arms.  *Id.*  On September 29, 2016, Mr. Ramirez was granted his request for a wheelchair pusher and cell assistant.  *See id.*

57.     Dr. Bernstein's decision to continually deny Mr. Ramirez's placement in the UPD, despite the repeated recommendations of P.A. Pagan, represents a policy of deliberate indifference to Mr. Ramirez's serious medical needs, which lasted after Mr. Ramirez's 2012 Surgery until Mr. Ramirez was transferred to Five Points on September 17, 2015.

58.     Due to the sustained deprivation of necessary medical treatment and failure to provide reasonable accommodations, Mr. Ramirez was forced to spend years unable to shower safely or live in a clean cell.

**D.     On August 6, 2015, Mr. Ramirez Is Assaulted By Sgt. Durland And C.O.s Wickham And Fox**

59.     On August, 6, 2015, Mr. Ramirez got into a verbal altercation with Sgt. Kaufman at the East Mess Hall, in the F&G corridor.  Due to the disturbance, Sgt. Kaufman instructed Mr. Ramirez to return to E Block, where he resided at the time.

60.     At approximately 5:20 p.m., Sgt. Kaufman directed C.O. Wickham to escort Mr. Ramirez back to E Block from the F&G corridor.

61.     As C.O. Wickham escorted Mr. Ramirez back to E Block, he was accompanied by C.O. Fox and Sgt. Durland.

62.     While escorting Mr. Ramirez to E Block, C.O. Fox made a comment insulting inmates who (like Mr. Ramirez) were confined to wheelchairs, claiming that they did not deserve the medical care they requested.

63.     Mr. Ramirez responded to C.O. Fox's provocation by insinuating that the officer should go ahead and beat him up if the officer had a problem with him and the other inmates in wheelchairs.

64.     When Mr. Ramirez and the escorting officers were in front of E Block, C.O. Wickham said to Mr. Ramirez, "can't you stand?"  Wickham grabbed Mr. Ramirez from the front of his shirt, pulled him from his wheelchair, and dropped him to the ground face first.

65.     Once Mr. Ramirez was lying helpless on the ground, C.O. Fox jumped on Mr. Ramirez, planting his knee into the left side of Mr. Ramirez's ribs.

66.     While C.O. Fox pinned Mr. Ramirez to the ground, C.O. Wickham punched Mr. Ramirez repeatedly in the exposed portion of his neck, back, and shoulders.

67.     Sgt. Durland kicked Mr. Ramirez numerous times as well.

68.     C.O. Fox placed handcuffs around Mr. Ramirez's wrists, stood on his lower back, yanked up his arms, and exclaimed, "He can take the pain."

69.     After the assault (the "August 2015 Assault"), the officers threw Mr. Ramirez back in his wheelchair, and attempted to take him back to E Block.  But when the block officer, Officer Reyes, saw Mr. Ramirez's condition, she instructed the escorting officers to take him to the medical unit.

70.     The officers then escorted Mr. Ramirez to the medical unit, where he was examined by Nurse Peter Loher.

**E.     The Assault Caused Injuries To Mr. Ramirez's Upper Body**

71.     Nurse Loher noted some of Mr. Ramirez's clearly apparent injuries, such as a laceration on his left hand.

72.    Photographs of Mr. Ramirez's wounds were taken, and Mr. Ramirez was placed in an isolation ("ISO room") in the Infirmary.





73.     On August 7, 2015, a nurse saw bruises developing on Mr. Ramirez's body, and brought a doctor to examine him.  The doctor felt Mr. Ramirez's ribs and decided he needed X-rays taken.

74.     On August 10, 2015, Mr. Ramirez was placed in solitary confinement in Green Haven's special housing unit (the "SHU"), without any wheelchair accommodations or necessary medical assistance.

75.     While in the Green Haven SHU, Mr. Ramirez's injuries worsened; marks from the handcuffs on both wrists remained, and the redness on his left arm, back, neck, knees, and legs turned into black-and-blue bruises.

76.     On August 17, 2016, Dr. Stephanie Zyck, a neurosurgeon at Upstate University Hospital, wrote in a progress note that Mr. Ramirez was in an "altercation in August 2015, at which time he sustained left wrist injury, left rib fractures, and a right shoulder injury.  He has also had neck pain and back pain in his upper to mid-thoracic area since that time.  This pain radiates into his medial two fingers bilaterally."  Ex. 18.

77.     On March 1, 2017, Dr. Shawn Rai, a resident at Upstate University Hospital, wrote a progress note detailing Mr. Ramirez's worsening symptoms:

> Jose A Ramirez is a 51 y.o. right-handed male w/ pmh significant for hypertension, chronic low back pain (s/p L2 laminectomy 6 years ago in NYC), ASA 325mg daily use, and neck pain (s/p C5-6 CDF) presents to us with complaints of continued neck pain, BUE and BLE weakness.  He now uses a wheelchair.  Symptoms have progressed gradually but have **worsened since an assault 2 years ago.**

Ex. 19 (emphasis added).

78.     On October 19, 2017, Mr. Ramirez was examined by Dr. Alexa Bodman, a neurosurgeon at Upstate University Hospital, who wrote the following:

> The neck pain radiates into both arms.  He mostly uses a wheelchair but is able to ambulate small distances with a walker, this has been since his back surgery.  His left leg is not functional and he has weakness of RLE.  He gets numbness in both

17

of his hands that is exacerbated by fine motor movements.  His hand dexterity has worsened and he has limited use of left hand.  He denies overt bowel/bladder incontinence, but does have some retention symptoms.  Overall, Mr. Ramirez's Symptoms have progressed gradually but have **worsened since an assault at his facility 2 years ago**.

Ex. 20 (emphasis added).

79.    To this day, Mr. Ramirez continues to suffer from the August 2015 Assault, which both exacerbated his pre-existing injuries and caused new ones.  Following the August 2015 Assault, Mr. Ramirez began suffering from severe upper body weakness that prevents him from lifting more than five pounds at a time, constant pain in his shoulders and back, and significantly reduced mobility of his neck.

## F.    To Cover Up Their Misconduct And To Further Harm Mr. Ramirez, Defendants Charge Mr. Ramirez With Rules Violations

80.    Sgt. Durland, C.O. Wickham, and C.O. Fox conspired amongst themselves to cover up the August 2015 Assault.

81.    After the August 2015 Assault on Mr. Ramirez, Sgt. Kaufman filed an Inmate Misbehavior Report alleging that Mr. Ramirez violated the following prison rules: (1) 104.13 (creating a disturbance); (2) 106.10 (refusing direct order); and (3) 109.12 (movement regulation violation).

82.    On August 6, 2015, C.O. Wickham filed an Inmate Misbehavior Report alleging that Mr. Ramirez violated the following prison rules: (1) 100.11 (assault on staff); (2) 104.13 (creating a disturbance); (3) 109.12 (movement regulation violation); (4) 107.10 (interference with an employee); (5) 107.11 (harassment); and (6) 106.10 (refusing direct order).  Sgt. Durland and C.O. Fox endorsed the report.

83.    On August 12, 2015, a Tier III hearing was held to adjudicate the allegations contained in the Misbehavior Reports (the "Tier III Hearing").  Mr. Ramirez pled guilty to charges

18

104.13 (creating a disturbance) and 109.12 (movement violation), and on August 25, 2015 he was found guilty on all other charges.

84.    As a result of being found guilty on all charges at the Tier III hearing, Mr. Ramirez was sentenced to 365 days in the SHU confinement, and loss of packages, commissary, and phone. These punishments were in addition to three months' loss of good time.

## G.    Mr. Ramirez Attempts To Seek Redress After The Assault

85.    On August 12, 2015, within a week of the August 2015 Assault, Mr. Ramirez submitted a grievance (the "August 2015 Grievance") to the IGRC explaining that Sgt. Durland and Officers Fox and Wickham "assa[u]ted me . . . kick[ed] me all over and punch[ed] me all over."

86.    After hearing nothing regarding his grievance for over a month, on September 7, 2015, Mr. Ramirez followed up with a letter to the IGRC inquiring into the status of the August 2015 Grievance.  Mr. Ramirez explained that he had already asked his counselor, Mr. Cifone, to check into the status of his grievance, but had not received a meaningful response.  Concerned that his grievance was not being processed properly, Mr. Ramirez specifically requested that he receive a grievance receipt.

87.    A week later, having still heard nothing regarding the status of the August 2015 Grievance, nor having even received confirmation of its receipt, Mr. Ramirez followed up yet again by writing a letter on September 12, 2015 to Superintendent Griffin, explaining the August 2015 Grievance's background, his diligent efforts to follow up, the fact that he had still received no response, and requesting that Superintendent Griffin "please look into this matter."

88.    On, or about, September 17, 2015—having still heard nothing about his pending grievance regarding the 2015 Assault—Mr. Ramirez was transferred to Five Points, where he was

immediately placed into the Special Housing Unit, a continuation of the punishment stemming from the Tier III Hearing following the August 2015 Assault.

89.     Determined to obtain a thorough investigation of the August 2015 Assault, on September 24, 2015, Mr. Ramirez drafted yet another grievance regarding the August 2015 Assault (the "September 2015 Grievance"), explaining that "I was in my wheelchair" when "I was kick[ed] and pu[n]ch[ed] all over" by Sgt. Durland and Officers Fox and Wickham.  Mr. Ramirez further explained that "I have copies of letters to the superintendent and copies of my grievance complaints" and offered to provide them if necessary.

90.     That same day, Mr. Ramirez wrote a letter to the superintendent of Five Points, explaining the background that "[o]n 8-6-2015 I was assaulted by C.O.s. at Green Haven C.F.[:] CO Wickham[,] CO Fox[,] and Sgt[.] Dufman [sic];" that, as a result, "I am in very bad pain"; but, nevertheless, "I have not seen a provider or MD" despite "put[t]ing in sick call[] slips."

91.     On October 1, 2015, Mr. Ramirez's September 2015 Grievance was marked as received.

92.     That same day, the IGRC passed Mr. Ramirez's grievance through to John Colvin, the superintendent of Five Points, and an investigation was commenced.

93.     On October 17, 2015, Sgt. Casper interviewed Mr. Ramirez, as part of the investigation into the September 2015 Grievance.  That same day, Sgt. Casper wrote a memo to update Capt. Shields on the investigation, stating that Mr. Ramirez told Casper he had no witnesses.

94.     On October 28, 2015, Mr. Ramirez received a belated response to the sick call slips he had been filing regarding his "very bad pain" from the Five Points Medical Department.  The

medical department explained, "We have been extrem[e]ly short staffed in medical and we are working diligently to get caught up on everything."

95.     Unable to receive the medical attention he needed, Mr. Ramirez wrote a letter to Dr. Carl Koenigsmann, then a Deputy Commissioner of DOCCS, on November 3, 2015.  The letter explained the history of Mr. Ramirez's medical condition, including the two "unsuccessful" back surgeries "that left [him] unable to walk," "in need of aftercare treatment," and "confined to a wheelchair."  It also described the "vicious[] assault[] by three (3) staff members" that left him "with injur[ie]s & seri[ou]s physical pain."  Finally, Mr. Ramirez explained that the medical department at Five Points had told him they were short-staffed, and sought Dr. Koenigsmann's help in securing medical attention.

96.     On November 5, 2015, over a month after submitting his grievance, Mr. Ramirez wrote a letter to follow up with the IGRC, explaining that the IGRC had still not responded to the August 2015 Grievance, and that he was therefore exercising his right to appeal the grievance to the Superintendent.

97.     That same day, Mr. Ramirez wrote a letter to Superintendent Colvin, explaining that he had likewise still not responded to the August 2015 Grievance, and that Mr. Ramirez was therefore exercising his right to appeal the grievance to the Central Office Review Committee (the "CORC").

98.     On November 17, 2015, Lt. Deacon, who investigated Mr. Ramirez's allegations, wrote a letter to the IGRC, stating that he found Mr. Ramirez's complaint without merit, referencing attached written statements submitted by Officers Fox and Wickham.  Lt. Deacon's memorandum explained that he did not speak to Sgt. Durland because he had been transferred out

of Green Haven.   Officers Fox and Wickham submitted identically worded statements "categorically deny[ing] all allegations."

99.     On November 22, 2015, Mr. Ramirez, still suffering, submitted another sick call requesting to see his provider regarding "pain that is not letting me sit too long."

100.    That same day—approximately three and a half months after initially submitting a grievance regarding the August 2015 Assault and nearly two months after submitting his second such grievance—Mr. Ramirez wrote another letter to Superintendent Colvin attempting to ascertain the status of his grievances.

101.    Finally, on November 28, 2015, Superintendent Colvin denied Mr. Ramirez's October 2015 Grievance, on the basis that Mr. Ramirez could not provide any evidence or witnesses and that the officers involved had denied the allegations (the "Superintendent Decision").   The superintendent also stated that his decision relied in part on the fact that Mr. Ramirez had been found guilty at the Tier III Hearing.

102.    Mr. Ramirez did not receive the superintendent's written decision until December 4, 2015, at which point he expressed his desire to exercise his right to appeal the Superintendent Decision to CORC.   That appeal was made on December 8, 2015.   The appeal was marked as received by CORC on December 16, 2015.

103.    Mr. Ramirez continued to suffer from "very bad pain" throughout this period, submitting another sick call seeking medical attention on December 4, 2015.

104.    Mr. Ramirez, however, continued to suffer from terrible pain, and, desperately seeking answers for "what is mak[]ing me suffer like this," submitted another grievance concerning his medical care on January 3, 2016.   Ex. 21.   The grievance explained that "I did not

have this much pain in till [sic] I was assaulted at Green Haven, I only had pain on my lower back, now I am ha[v]in[g] pain on u[p]per back neck [arms]." *Id.*

105.    Although Mr. Ramirez was able to schedule at least one appointment with a medical care provider to "discuss chronic pain management," his symptoms did not improve.  As a result, Mr. Ramirez filed additional sick calls concerning his unabating pain on February 1, 2016 and February 14, 2016.

106.    On March 16, 2016, CORC considered Mr. Ramirez's appeal of Superintendent Colvin's denial of the September 2015 Grievance concerning the August 2015 Assault and upheld the Superintendent Decision.

107.    Not only was Mr. Ramirez unable to obtain redress through the administrative process for the injuries he sustained on August 6, 2015, he continues to suffer from the impact of that vicious assault to this day.

108.    As Mr. Ramirez explained in January 2016, Ex. 21, the botched back surgeries in 2011 and 2012 left him wheelchair-bound with lower body pain and weakness.  The August 2015 Assault, however, left him with permanent pain and weakness in his upper back, neck, and arms.

109.    While at Green Haven—as a wheelchair-bound inmate left in a non-wheelchair-accessible cell—Mr. Ramirez had been forced to rely on his upper body strength to maintain his balance while performing basic activities each day, such as showering or maneuvering around his cell.

110.    After the August 2015 Assault and the resulting damage to Mr. Ramirez's upper body, Mr. Ramirez could no longer rely on upper body strength.

111.    Recognizing the gravity of Mr. Ramirez's condition, in September 2016, the medical staff at Five Points granted Mr. Ramirez what Dr. Bernstein repeatedly denied at Green Haven—a request for reasonable accommodation.  Ex. 17.

112.    The granted request for reasonable accommodation, signed by Dr. Belgard, provided Mr. Ramirez with a "wheelchair pusher and cell assistant" in light of his "neck pain, upper extremity weakness . . . cervical spinal stenosis" and his "[f]unctional limitations" with respect to his "use of arms." Ex. 17.  These accommodations were precisely the kind of assistance Mr. Ramirez had so diligently sought—and been denied—through admittance to the UPD at Green Haven.

113.    Today, Mr. Ramirez is no longer in prison.  But he continues to feel the impact of the injuries and trauma he suffered from deficient medical care, unconstitutional conditions of confinement, the failure to reasonably accommodate his disabilities, and the excessive use of force against him during his incarceration at Green Haven.  Mr. Ramirez, permanently relegated to a wheelchair, continues to suffer from terrible pain in his neck and back, as well as severe emotional trauma stemming from the August 2015 Assault.  Mr. Ramirez continues to regularly see medical specialists and take prescription medication to treat these injuries to this day.

**FIRST CAUSE OF ACTION:**

**VIOLATIONS OF PLAINTIFF'S CIVIL RIGHTS UNDER THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION (EXCESSIVE FORCE) BY SGT. DURLAND AND OFFICERS FOX AND WICKHAM**

114.    Mr. Ramirez repeats and realleges each and every allegation set forth in paragraphs 1 through 113 above as if set forth in full herein.

115.    Through the conduct alleged in paragraphs 1 through 113, Defendants Wickham, Fox, and Durland have deprived Mr. Ramirez of his Eighth Amendment rights.

24

116.    Defendants Wickham, Fox, and Durland used excessive force against Mr. Ramirez for no purpose other than to cause him physical and emotional harm.

117.    Defendants, each individually and in concert with the others, acted under color of state law when they deprived Mr. Ramirez of his federal constitutional rights.

118.    As a direct and proximate result of Defendants' deprivations of Mr. Ramirez's federal constitutional rights, Mr. Ramirez has sustained physical injuries, emotional trauma, and other damages.

119.    Defendants are jointly and severally liable for Mr. Ramirez's injuries, under 42 U.S.C. § 1983.

## SECOND CAUSE OF ACTION:

### VIOLATIONS OF PLAINTIFF'S CIVIL RIGHTS UNDER THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION (DEFICIENT MEDICAL CARE AND CONDITIONS OF CONFINEMENT) BY DR. BERNSTEIN

120.    Mr. Ramirez repeats and realleges each and every allegation set forth in paragraphs 1 through 119 above as if set forth in full herein.

121.    Through the conduct alleged in paragraphs 1 through 119, Dr. Bernstein has deprived Mr. Ramirez of his rights under the Eighth Amendment to the United States Constitution.

122.    Dr. Bernstein acted under color of state law when he deprived Mr. Ramirez of his Eighth Amendment rights.

123.    Mr. Ramirez had a serious need to be placed in the UPD because he required the use of a wheelchair, had difficulty getting in and out of his cell without assistance, struggled to access the shower without assistance, and had trouble bending down to clean his cell.

124.    Dr. Bernstein knew of, or was deliberately indifferent to, Mr. Ramirez's serious medical need by denying him admittance to the UPD, even though Mr. Ramirez's primary care providers, including P.A. Pagan, recommended that Mr. Ramirez be admitted.

125.    Dr. Bernstein did not conduct his own medical examination of Mr. Ramirez in determining whether to admit him to the UPD.

126.    As a direct and proximate result of Dr. Bernstein's failure to adequately address Mr. Ramirez's medical needs, Mr. Ramirez was denied the minimal civilized measures of life's necessities, and was forced to spend years struggling with basic activities of daily living, such as showering and cleaning his cell.  These struggles were humiliating, caused him physical injuries, and subjected him to the possibility of serious bodily injury.  For example, given that Mr. Ramirez was wheelchair-bound and had his request for placement in the UPD and a shower chair callously denied, he was often faced with the choice between attempting to hold himself up in the shower without any seating (at great risk to his safety), having his fellow inmates carry him and his wheelchair into the shower (soaking his wheelchair and causing it to smell), or skipping a shower altogether.  The deprivation of adequate medical care also resulted in Mr. Ramirez's placement in a non-wheelchair-accessible cell, requiring him to leave his wheelchair outside the cell and reach his bed by grabbing on to the cell bars and dragging himself into the room and onto the bed—a dangerous maneuver that resulted in scarring on his legs.  The cell was also in a constant state of disarray, as Mr. Ramirez was physically unable to bend down to clean it himself and was denied reasonable assistance.

127.    Dr. Bernstein acted under color of state law when he deprived Mr. Ramirez of his federal constitutional rights.

128.    As a direct and proximate result of Dr. Bernstein's deprivations of Mr. Ramirez's federal constitutional rights, Mr. Ramirez was placed at risk of serious harm and sustained physical injuries, emotional trauma, and other damages.

129.    Dr. Bernstein is sued in his individual capacity under 42 U.S.C. § 1983.

130.    Dr. Bernstein is liable for Mr. Ramirez's injuries under 42 U.S.C. § 1983.

### THIRD CAUSE OF ACTION:

### VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12131, ET SEQ. BY DR. BERNSTEIN

131.    Mr. Ramirez repeats and realleges each and every allegation set forth in paragraphs 1 through 130 above as if set forth in full herein.

132.    Title II of the ADA, 42 U.S.C. § 12132, prohibits a public entity from excluding a person with a disability from participating in or denying the benefits of a program of the public entity to a person with a disability or otherwise discriminating against a person on the basis of disability.

133.    The ADA defines "disability" as a physical or mental impairment that substantially limits one or more of the major life activities of such individual; having a record of such impairment; or being regarded as having such impairment, as defined under the ADA at 42 U.S.C. § 12102(2) and U.S. Department of Justice ("DOJ") implementing regulations, 28 C.F.R. § 35.104.

134.    Mr. Ramirez has a "disability," within the meaning of the ADA and implementing regulations, because he is confined to a wheelchair and can ambulate only short distances without assistance.  The weakness in his legs makes it difficult for Mr. Ramirez to shower, clean his cell, and get into and out of bed.

135.    A "public entity" includes state and local governments, their agencies, and their instrumentalities, as defined by the ADA, 42 U.S.C. § 12131(1).

136.    Dr. Bernstein, as the facilities health services director at Green Haven at all relevant times, was an official of DOCCS.

137.    Dr. Bernstein is sued in his official capacity under Title II of the ADA, 42 U.S.C. § 12132.

138.    A defendant sued in his official capacity is a public entity within the meaning of 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104.

139.    Mr. Ramirez is a "qualified individual with a disability" as defined by the ADA, 42 U.S.C. § 12131(2) and implementing regulations, 28 C.F.R. § 35.104, because he is an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by DOCCS.

140.    By failing to meet Mr. Ramirez's unique needs, Dr. Bernstein discriminated against him in violation of 42 U.S.C. § 12132 and DOJ's implementing regulations, 28 C.F.R. § 35.130.

141.    Dr. Bernstein's conduct, as alleged in paragraphs 1 through 113, constituted an ongoing and continuous violation of the ADA.

142.    As a direct and proximate result of Dr. Bernstein's failure to reasonably accommodate Mr. Ramirez's disability, as required by the ADA, Mr. Ramirez was forced to spend years struggling with basic activities of daily living, such as showering and cleaning his cell.  These struggles were humiliating, caused him physical injuries, and subjected him to the possibility of serious bodily injury.  For example, given that Mr. Ramirez was wheelchair-bound and had his request for placement in the UPD and a shower chair callously denied, he was often faced with the choice between attempting to hold himself up in the shower without any seating (at great risk to his safety), having his fellow inmates carry him and his wheelchair into the shower (soaking his wheelchair and causing it to smell), or skipping a shower altogether.  The deprivation of reasonable

accommodations for his disabilities and adequate medical care also resulted in Mr. Ramirez's placement in a non-wheelchair-accessible cell, requiring him to leave his wheelchair outside the cell and reach his bed by grabbing on to the cell bars and dragging himself into the room and onto the bed—a dangerous maneuver that resulted in scarring on his legs.  The cell was also in a constant state of disarray, as Mr. Ramirez was physically unable to bend down to clean it himself and was denied reasonable assistance.

### FOURTH CAUSE OF ACTION:

**VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT OF 1973, 29 U.S.C. § 794 ET SEQ. BY DR. BERNSTEIN**

143.    Mr. Ramirez repeats and re-alleges each and every allegation set forth in paragraphs 1 through 142 above as if set forth in full herein.

144.    Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and its implementing regulations, prohibits discrimination against persons with disabilities by federal agencies and recipients of federal funding.

145.    DOCCS, is a "recipient" of "federal financial assistance," as defined by Section 504 of the Rehabilitation Act of 1973 and by implementing regulations, thereby rendering them subject to Section 504.  29 U.S.C. § 794(b)(1); 28 C.F.R. § 41.3(d)–(e); 45 C.F.R. § 84.3(f)–(h); 7 C.F.R. § 15b.3(f)–(g).

146.    Dr. Bernstein, as the facilities health services director at Green Haven at all relevant times, was an official of DOCCS.

147.    Mr. Ramirez has a "disability," as that term is used in Section 504 of the Rehabilitation Act.  Like the ADA, Section 504 defines a disability as "a physical or mental impairment that substantially limits one or more of major life activities of such individual."  29 U.S.C. § 705(20)(B).

148.    Mr. Ramirez is a "handicapped person," as that term is used in regulations implementing Section 504.  Section 504 regulations define a handicap as a physical or mental impairment that substantially limits one or more of the major life activities of such individual.  28 C.F.R. § 41.31(a); 45 C.F.R. § 84.3(j), (l); 7 C.F. R. § 15b.3(i).

149.    Mr. Ramirez meets the essential eligibility requirements for the receipt of services and is therefore a "qualified handicapped person," as that term is defined in regulations implementing Section 504.  28 C.F.R. § 41.32; 45 C.F.R. § 84.3(l); 7 C.F.R. § 15b.3(n)(4).  Mr. Ramirez was wheelchair-bound and had his request for a shower chair callously denied, he was often faced with the choice between attempting to hold himself up in the shower without any seating (at great risk to his safety), having his fellow inmates carry him and his wheelchair into the shower (soaking his wheelchair and causing it to smell), or skipping a shower altogether.  The deprivation of reasonable accommodations and adequate medical care for his disabilities also resulted in Mr. Ramirez's placement in a non-wheelchair-accessible cell, requiring him to leave his wheelchair outside the cell and reach his bed by grabbing on to the cell bars and dragging himself into the room and onto the bed—a dangerous maneuver that resulted in scarring on his legs.  The cell was also in a constant state of disarray, as Mr. Ramirez was physically unable to bend down to clean it himself and was denied reasonable assistance.

150.    Dr. Bernstein is sued in his official capacity under the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*

151.    Dr. Bernstein's conduct, as alleged in paragraphs 1 through 113, constituted an ongoing and continuous violation of the RA.

152.    Dr. Bernstein discriminated against Mr. Ramirez in violation of 29 U.S.C. § 794(a) and its implementing regulations, 28 C.F.R. § 41.51; 45 C.F.R. § 84.4; 7 C.F.R. § 15b.4, by

refusing to make the reasonable accommodation of admitting Mr. Ramirez to the UPD and forcing Mr. Ramirez to spend years struggling with basic activities of daily living, such as showering and cleaning his cell.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter the following relief:

a.  Judgment in favor of Plaintiff against each Defendant;

b.  A judgment awarding Plaintiff all available damages for Defendants' violations of Plaintiff's constitutional rights, including compensatory and punitive damages under 42 U.S.C. § 1983, and compensatory damages for violation of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act;

c.  An order granting Plaintiff his attorneys' fees under 42 U.S.C. § 1988;

d.  An order granting Plaintiff the costs, fees and disbursements incurred in connection with these proceedings; and

e.  Such further relief as this Court deems just and proper.


Dated: New York, New York
December 14, 2020

Respectfully Submitted,

GIBSON, DUNN & CRUTCHER LLP

By: /s/ David M. Kusnetz

David M. Kusnetz
Jason M. Bressler
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
dkusnetz@gibsondunn.com
jbressler@gibsondunn.com

*Attorneys for Plaintiff Jose Ramirez*